## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| JILL HARBOLT, | ) | CASE NO. 5:17CV1011 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Jill Harbolt, ("Plaintiff" or "Harbolt"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her applications for Period of Disability ("POD"), Disability Insurance Benefits

("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act")**.**  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends the

Commissioner's final decision be AFFIRMED.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

1

# I.  PROCEDURAL HISTORY

In February 2014, Harbolt filed applications for POD, DIB, and SSI, alleging a disability onset date of September 14, 2013 and claiming she was disabled due to fibromyalgia, depression, anxiety, bipolar disorder, panic disorder, "bone disease," and back problems.  (Transcript ("Tr.") 326, 330, 349.)  The applications were denied initially and upon reconsideration, and Harbolt requested a hearing before an administrative law judge ("ALJ").  (Tr. 284.)

On January 20, 2016, an ALJ held a hearing, during which Harbolt, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 161.)  On February 16, 2016, the ALJ issued a written decision finding Harbolt was not disabled.  (Tr. 158.)  The ALJ's decision became final on March 21, 2017, when the Appeals Council declined further review. (Tr. 1.)

On May 15, 2017, Harbolt filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 13, 15, 16.) Harbolt  asserts the following assignments of error:

(1) The ALJ failed to state valid reasons for rejecting the opinions and statements, including GAF scores, of the treating physicians in the record.

(2) The ALJ did not properly evaluate Harbolt's credibility.

(3) The ALJ did not meet his burden at Step Five of the Sequential Evaluation.

(Doc. No. 13.)

# II.  EVIDENCE

## A.    Personal and Vocational Evidence

Harbolt was born in April 1966 and was 49 years-old at the time of her administrative hearing, making her a "younger" person under social security regulations.  (Tr. 174.)  *See* 20

2

C.F.R. §§ 404.1563(c) & 416.963(c).  She has a high school education and is able to

communicate in English.  (*Id.*)  She has past relevant work as an assembler and cashier.  (*Id.*)

**B.      Medical Evidence**[2]

      **1.            Mental Impairments**

On October 3, 2013, Harbolt visited her primary care doctor, Dr. Bhoomreddy, M.D.,

reporting depression and anxiety.  (Tr. 455.)  She indicated increased stress over her son's cancer

diagnosis and denied any prior treatment with a counselor or psychiatrist.  (*Id.*)  Dr. Bhoomreddy

discussed coping skills with Harbolt, and referred her to Portage Path Behavioral Health for

treatment.  (Tr. 456.)

Harbolt followed up with Dr. Bhoomreddy on October 23, 2013, indicating increased

anger and anxiety.  (Tr. 452.)  She reported she was too anxious to use public transportation.  (Tr.

453.)  During the office visit, Dr. Bhoomreddy observed Harbolt was disheveled and agitated,

with poor eye contact.  (Tr. 452.)  Dr. Bhoomreddy again encouraged Harbolt to seek treatment

at Portage Path.  (Tr. 453.)

Harbolt visited Portage Path Behavioral Health for an intake assessment on November 6,

2013.  (Tr. 420.)  She reported depression and anxiety, and a reluctance to leave her home.  (*Id.*)

She described poor sleep, suicidal ideation, hopelessness, and daily panic attacks.  (Tr. 421, 423.)

She indicated she was both easily angered and distracted.  (Tr. 422.)  The examiner, therapist

Megan Yetzer, M.A., noted Harbolt required redirection several times during the interview.  (Tr.

427.)  Ms. Yetzer diagnosed Harbolt with post-traumatic stress disorder ("PTSD"), mood

---

[2]      The Court notes its recitation of the medical evidence is not intended to be
exhaustive and is limited to the evidence cited in the parties' Briefs.

disorder, not otherwise specified, and generalized anxiety disorder.  (Tr. 428, 429.)  She assigned

Harbolt a global assessment of functioning ("GAF")[3] score of 51, indicating moderate symptoms.

(Tr. 429.)

On November 13, 2013, Harbolt had a therapy session with Ms. Yetzer at Portage Path.

She was tearful during the session.  (Tr. 414.)  Ms. Yetzer provided her information on local food

banks, as well as information on obtaining a case manager.  (Tr. 414, 415.)  Harbolt returned to

Portage Path on November 20, 2013, indicating she had not started her medications, as she had

an upcoming trip to Florida and did not want to experience any side effects while traveling.  (Tr.

417.)  She also reported she had quit her most recent job due to fear of a co-worker.  (*Id*.)

Harbolt returned to Portage Path on December 19, 2013 for a medication management

appointment with mental health nurse specialist Judith Corcelli, PMHCNS-BC.  (Tr. 432, 434.)

She indicated her trip to Florida was difficult, as she was visiting her daughter with bipolar

disorder.  (Tr. 432.)  She reported she had been taking her medications for seven days, and had

not experienced any issues.  (*Id*.)

On January 8, 2014, Harbolt reported to Ms. Yetzer she was "having problems with her

medication."  (Tr. 435.)  She indicated she had enjoyed her trip to Florida, but found it stressful

due to her daughter's mood swings.  (*Id*.)  She denied any suicidal ideation.  (*Id*.)  Harbolt

---

[3]        The GAF scale reports a clinician's assessment of an individual's overall level
of functioning.  An individual's GAF is rated between 0-100, with lower numbers
indicating more severe mental impairments.  A GAF score between 51 and 60 indicates
moderate symptoms or moderate difficulty in social, occupational, or school functioning.
A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of
clarity . . . and questionable psychometrics in routine practice."  *See Diagnostic and
Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th
ed., 2013).

returned to Portage Path for medication management on March 25, 2014.  (Tr.  444.)  She

indicated her medications were not improving her symptoms.  (*Id.*)  She described a fear of

leaving her home and poor sleep.  (*Id.*)  The prescriber, Tiffany Harrison,[4] noted Harbolt had

only been taking half of her prescribed dosage of Trileptal, and instructed her to take the full

dosage.  (*Id.*)

On May 30, 2014, Harbolt switched mental health providers, and underwent a diagnostic

assessment at Coleman Professional Services with social worker Shandi Olminsky.  (Tr. 467.)

She reported severe depression, a fear of leaving her home, anxiety, poor sleep, and ongoing

memory and attention issues.  (Tr. 467, 481.)  She indicated she was currently living with a

friend.  (Tr. 469.)  She also relayed she smoked marijuana with a friend 3-4 times a week for

anxiety relief.  (Tr. 474.)  Ms. Olminsky diagnosed Harbolt with anxiety state, not otherwise

specified; episodic mood disorder, not otherwise specified; cannabis dependance; and rule out

attention deficit hyperactivity disorder ("ADHD").  (Tr. 484.)  She assigned Harbolt a GAF score

of 45, indicating serious symptoms.  (Tr. 485.)

On July 7, 2014, Harbolt returned to Coleman Professional Services for counseling with

Vickie Hanna, LISW-S.  (Tr. 496.)  She reported improved sleep, but continued depression,

irritability, and frustration.  (*Id.*)  She also indicated she had recently contacted the suicide

hotline, due to high levels of pain.  (Tr. 497.)  Ms. Hanna noted Harbolt appeared stable.  (*Id.*)

On July 31, 2014, Harbolt visited nurse practitioner Lila Jenkins, CNP, at Coleman

Professional Services.  (Tr. 487.)  She described flashbacks to childhood abuse and social

isolation.  (*Id.*)  Ms. Jenkins diagnosed Harbolt with anxiety disorder, mood disorder, and

---

[4]        No credentials were provided for Tiffany Harrison in the medical evidence.

cannabis dependance.  (Tr. 489.)  She assigned Harbolt a GAF score of 45, and prescribed Effexor.  (Tr. 489, 491.)

On September 4, 2014, Harbolt visited psychiatrist Bradley Winkhart, M.D., at Coleman Professional Services.  (Tr. 518.)  She indicated she had recently threatened to commit suicide, but denied any current suicidal ideation.  (*Id.*)  She returned to Dr. Winkhart on September 17, 2014, reporting she had discontinued taking her psychotropic medications, due to persistent vomiting.  (*Id.*)  She reported racing thoughts and poor sleep.  (Tr. 519.)  Dr. Winkhart assigned her a GAF score of 45.  (Tr. 527.)

Harbolt saw Dr. Winkhart again on October 16, 2014, reporting she was taking her medications, but was "not sure if she has been taking her medications as she should."  (Tr. 519.)  Dr. Winkhart assigned her a GAF score of 45.  (Tr. 521.)  Harbolt followed up with Dr. Winkhart on December 18, 2014.  (Tr. 730.)  She had multiple somatic complaints, but indicated her medications were helpful.  (*Id.*)  She reported depression, with occasional suicidal ideation.  (*Id.*)  Dr. Winkhart again assigned her a GAF score of 45.  (Tr. 732.)

On March 5, 2015, Harbolt reported fluctuating moods to Dr. Winkhart, but denied any suicidal ideation.  (Tr. 711.)  Her GAF score continued to be 45.  (Tr. 726.)  On May 7, 2015, Dr. Winkhart noted Harbolt had been compliant with her medications, but was still having bouts of anxiety and anxiety attacks.  (Tr. 711.)  However, Harbolt indicated her medications were somewhat helpful, and she denied suicidal ideation. (*Id.*)  Her GAF score was again 45.  (Tr. 720.)

Harbolt visited Dr. Winkhart on September 24, 2015, reporting continued depressive symptoms and social isolation.  (Tr. 711.)  She denied suicidal ideation and reported medication

compliance. (*Id.*)  Her GAF score was 45.  (Tr. 713.)

On December 28, 2015, Shandi Rothman, LISW, submitted a letter regarding Harbolt,

which provided the following:

> Ms. Jill Harbolt has been in counseling at Coleman Behavioral Health since
> June 17, 2014.  She primarily worked with Vickie Hanna LISW-S until
> recent transfer to me on October 29, 2015.  Jill continues to work on
> managing daily emotions (anxiety/panic, anger and depression).  Typically
> through Jill's course of treatment she has met with her counselor bi-weekly.
> Jill is also being seen in psychiatry by Dr. Bradley Winkhart.

(Tr. 771.)  That same date, case manager Morgan Myers, CMII, also submitted a letter regarding

Harbolt:

> Ms. Jill Harbolt has been on my caseload since April 3, 2015 and has been
> with Coleman Behavioral Services as a whole since May 28, 2014.  We
> have primarily worked on issues regarding anxiety, panic, anger, and
> depression.  Ms. Harbolt states [she is] experiencing increased anxiety while
> driving, as well as being outside of her home for extended periods of time.  I
> primarily see Ms. Harbolt biweekly in order to monitor medication
> compliance, discuss daily stressors, maintain continuity of care by
> reviewing upcoming appointments, and transporting if necessary.  Ms.
> Harbolt is also currently under the care of Shandi Rothman, LISW for
> counseling, as well as Dr. Bradley Winkhart for psychiatry.

(Tr. 772.)

On January 21, 2016, psychiatrist Meredith Mahilo, M.D., filled out a form prepared by

Harbolt's attorney.  On this form, she noted Harbolt had the following limitations:

- She would miss about two days of work per month;

- She would be off-task 5% of the workday; and

- She would need to take one extra unscheduled break during the
  workday.

(Tr. 874-875.)  Dr. Mahilo further found no observable limits for the following tasks or

functions:

- Remember locations and work-like procedures;

- Understand, remember, and carry out very short, simple instructions;

- Understand, remember, and carry out detailed instructions;

- Perform activities within a schedule, maintain regular attendance, and/or be punctual within customary tolerances;

- Sustain an ordinary routine without special supervision;

- Work in coordination with or proximity to others without being distracted by them;

- Make simple work-related decisions;

- Complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;

- Interact appropriately with the general public;

- Ask simple questions or request assistance;

- Accept instructions and respond appropriately to criticism from supervisors;

- Get along with coworkers or peers without distracting them or exhibiting behavioral extremes;

- Maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness;

- Respond appropriately to changes in the work setting;

- Be aware of normal hazards and take appropriate precautions; and

- Set realistic goals or make plans independently of others.

(*Id*.)  Dr. Mahilo opined Harbolt would have noticeable difficulty traveling in unfamiliar places or using public transportation for more than 20% of the workweek or workday.  (Tr. 875.)  Dr.

8

Mahilo then provided the following discussion regarding Harbolt:

> My medical findings are limited to a single psychiatric evaluation
> encounter, which revealed the patient has panic attacks a few times per
> month.  Therefore, her panic attacks could cause a few work absences per
> month for treatment, but this estimate is based on limited information. Her
> anxiety could cause minimal "off task" time in a day, based on my limited
> assessment and knowledge of this patient.  This may necessitate her to take
> a work break of unknown duration.  Otherwise her mental status exam did
> not show any further limitations during our one encounter.  Also, she takes
> medications for her panic attacks as needed, which allow her to function
> with her anxiety [not legible] and limit interruptions via absences.
>
> ***
>
> It is relevant that I have only had one interaction with this patient for an
> evaluation, and can only make an assessment based on one encounter.  At
> that assessment, the patient displayed a normal mental status exam and my
> assessment is based on a history of her panic attacks, which are infrequent
> and self reported as a few times per month with limited impairment.  She
> also takes medications which adequately treat those symptoms and improve
> her functioning.

(Tr. 876.)

## 2.       Physical Impairments

On January 13, 2012, Harbolt consulted with pain management physician Tracy

Neuendorf, D.O., for chronic back and neck pain.  (Tr. 611.)  She reported she had fallen down

steps in 1996, had a laminectomy at L5-S1 in 1998, sustained a compression fracture in 2008,

and was involved in a motor vehicle accident in 2012.  (*Id.*)  On examination, she had negative

straight leg raises, but significant muscle spasms and trigger point activity in her lumbar spine.

(Tr. 613.)  She had significant tenderness over the bilateral sacroiliac joints.  (*Id.*)  Dr. Neuendorf

advised her to continue performing home exercises and obtain an updated MRI.  (*Id.*)  Harbolt

then underwent a bilateral sacroiliac joint injection and lateral sacral nerve injection on January

27, 2012.  (Tr. 609.)

9

Harbolt presented to the emergency room on February 10, 2012, reporting back pain. (Tr. 605.) She reported she ran out of Percocet a few days prior, and was having breakthrough chronic pain. (*Id*.) On examination, she had negative straight leg raises, with paraspinal tenderness. (*Id*.) The emergency room physicians provided her with a short course of Percocet. (*Id*.)

On February 16, 2012, Harbolt followed up with Dr. Neuendorf, reporting her last injection provided 90% relief for 6-7 days, followed by 50-60% relief over the past few weeks. (Tr. 600.) Dr. Neuendorf then administered another bilateral sacroiliac joint injection. (*Id*.)

On March 13, 2012, Harbolt visited the emergency room for back pain and incontinence. (Tr. 594.) A lumbar MRI revealed degenerative changes with no significant stenosis, minimal bulging of the disc annulus at L4-5, and a diffuse disc bulge at L5-S1. (Tr. 596-597.) Harbolt had slightly decreased sensation in her right leg, and mild tenderness in her lumbar spine. (*Id*.) The emergency room physician provided her with 8 Percocet tablets, and advised her to follow up with her doctor. (Tr. 595.)

Harbolt returned to Dr. Neuendorf on March 16, 2012. She indicated 100% relief for two weeks after her most recent injection, followed by 80% relief for the past few weeks. (Tr. 591.) Dr. Neuendorf administered a third bilateral sacroiliac joint injection and lateral sacral nerve injection. (*Id*.)

On October 19, 2012, Harbolt visited the emergency room, reporting foot pain. (Tr. 589.) She indicated she was walking her dog, and fell down and twisted her foot. (*Id*.) Her foot x-ray was negative for fracture. (*Id*.) Harbolt returned to the emergency room on January 25, 2013, reporting abdominal pain. (Tr. 584.) A CT scan of her abdomen, as well as her labwork, was

10

negative.  (*Id*.)

Harbolt visited the emergency room on September 4, 2013, reporting a headache and abdominal pain.  (Tr. 564.)  She indicated she had been experiencing diarrhea and vomiting for the past 2-3 days.  (Tr. 566.)  On examination, her bowel sounds were normal.  (Tr. 564.)  She was discharged with Dilaudid and Zofran.  (Tr. 567.)

On September 11, 2013, Harbolt initially saw primary care doctor Neha Bhoomreddy, M.D., for abdominal pain, nausea, diarrhea, and headaches.  (Tr. 457.)  On examination, her abdomen was soft and tender.  (*Id*.)  She had a normal range of motion with no clubbing or edema in her extremities, and right paraspinal tenderness with palpation.  (*Id*.)

Harbolt visited the emergency room on October 16, 2013, reporting nausea and vomiting. (Tr. 503.)  Her abdomen was diffusely tender, but her physical examination was otherwise unremarkable.  (*Id*.)  An abdominal CT scan indicated no acute process, but there was evidence of fatty infiltration of the liver and a calcaneal calculus upper pole collecting system in the left kidney.  (Tr. 507.)

Harbolt returned to Dr. Bhoomreddy on April 22, 2014, reporting continued back pain. (Tr. 449.)  She requested a referral to a pain management practice, as she recently obtained health insurance.  (*Id*.)  She also indicated she was not satisfied with her care at Portage Path.  (*Id*.)  Dr. Bhoomreddy referred Harbolt to Coleman Behavioral Health for further care.  (Tr. 450.)

Harbolt visited the emergency room on June 21, 2014, reporting shoulder and neck pain. (Tr. 549.)  The examining physician noted a painful spinal range of motion, however, the pain was "out of proportion to exam" as "light palpation elicits profound pain."  (Tr. 551.)  During the emergency room visit, Harbolt described sadness and guilt, but denied any suicidal ideation.  (Tr.

11

552.)  Harbolt was discharged with Prednisone, Percocet, and Zofran.  (*Id*.)

On June 24, 2014, Harbolt initially visited the Summa Barberton Family Practice Center for emergency room follow up.  (Tr.  464.)  She saw primary care doctor Christopher Bursley, M.D., and reported severe pain, a headache, and fibromyalgia.  (*Id*.)  She indicated she had been taking ibuprofen, which was not helpful.  (*Id*.)  She also reported she was switching physicians because her prior doctor recommended physical therapy.  (*Id*.)  Dr. Bursley noted Harbolt was in no acute distress, and prescribed Amitriptyline and Mobic.  (Tr. 464, 465.)

Harbolt returned to Summa Barberton Family Practice Center on August 8, 2014, and treated with primary care doctor Suman C. Vellanki, M.D.  (Tr. 545.)  She reported a long-standing diagnosis of fibromyalgia and high levels of pain.  (*Id*.)  She indicated she had tried many different medications in the past, but none had been helpful.  (Tr. 546.)  Upon examination, Dr. Vellanki noted Harbolt was in mild distress due to whole body pain, and referred her to a pain management physician.  (Tr. 545, 546.)

On September 12, 2014, Harbolt returned to Summa Barberton Family Practice Center and treated with primary care physician Dr. Vu Tran, M.D.  (Tr. 542.)  She indicated she had not been able to see a pain management physician due to her insurance coverage.  (Tr. 543.)  She described continued all-over body pain, along with dizziness.  (Tr. 542, 543.)  On examination, she had no joint swelling, a normal range of motion in her joints, full range of motion in her shoulders, and no muscle weakness.  (Tr. 543.)  Dr. Tran referred Harbolt to a rheumatologist for evaluation.  (Tr. 542.)

Harbolt saw primary care doctor Saadia Mohsin, M.D., at the Summa Barberton Family Practice Center on November 12, 2014.  (Tr. 540.)  She reported continued chronic pain, and

indicated she was smoking marijuana daily in an attempt to alleviate her pain. (*Id.*) Dr. Mohsin ordered x-rays of Harbolt's cervical spine and referred her to physical therapy. (Tr. 541.) The cervical spine x-rays revealed mild to moderate degenerative changes at the C6-7 level, with no significant neural foraminal narrowing. (Tr. 547.)

On February 16, 2015, Harbolt visited the emergency room for abdominal pain. (Tr. 676.) When the emergency room staff inquired if she had any suicidal ideation, she responded "if this doesn't go away I might." (*Id.*) Her abdominal x-rays were unremarkable and she was discharged. (Tr. 685, 686.) Harbolt returned to the emergency room on February 25, 2015, again reporting abdominal pain. (Tr. 752.) On examination, she had abdominal tenderness and slight distention. (Tr. 753.) Diagnostic testing indicated no evidence of any acute intra-abdominal pathology. (*Id.*) During her emergency room visit, her abdominal pain did not improve, so she was admitted for observation. (*Id.*)

Harbolt visited the emergency room again on May 27, 2015, reporting left shoulder pain. (Tr. 663.) She indicated she had injured her left shoulder after lifting her dogs into the bathtub. (*Id.*) On examination, she had pain with palpation in her left shoulder, but a full and active passive range of motion. (Tr. 665.) The emergency room doctors advised her she did not need x-rays, but Harbolt insisted on imaging. (Tr. 666.) The x-rays of her left shoulder and left foot indicated no fracture or acute process. (*Id.*) The emergency room doctor, Neal Kaforey, M.D., advised Harbolt "to not lift anything heavier than 10 pounds [on] the left arm." (*Id.*)

On June 10, 2015, Harbolt switched primary care offices, and began to treat with primary care physician Martin Hendrickson, D.O. (Tr. 646.) Harbolt indicated her anxiety and depression were currently controlled. (Tr. 647.) On examination, Harbolt had minimal

tenderness in her back, normal muscle strength in her thighs and ankles, normal sensation in her extremities, and normal gait and station.  (Tr. 648.)  Dr. Hendrickson ordered labwork, a colonoscopy, and a mammogram.  (Tr. 646.)

Harbolt returned to Dr. Hendrickson on July 1, 2015, again indicating controlled depression.  (Tr. 641.)  On examination, she had no tenderness in her abdomen, a normal gait and station, minimal to mild tenderness in her back, and normal muscle strength in her thighs and ankles.  (Tr. 640.)  Dr. Hendrickson switched Harbolt's Cymbalta to Amitriptyline, in an attempt to gain control of her fibromyalgia.  (Tr. 641.)

A July 21, 2015 bone density scan revealed evidence of osteoporosis in the lumbar spine and hip.  (Tr. 635, 636.)

On August 16, 2015, Harbolt visited the emergency room for back and neck pain.  (Tr. 697.)  On examination, she had positive straight leg raises on both legs, but a negative neurological exam.  (Tr. 698.)  A cervical spine x-ray indicated mild intervertebral disc degenerative changes at the C6-7 level.  (Tr. 634.)  A lumbar spine x-ray indicated moderate intervertebral disc degenerative changes at the L5-S1 level.  (Tr. 633.)

Harbolt visited Dr. Hendrickson on August 18, 2015, reporting back pain radiating down her left leg.  (Tr. 632.)  On examination, she had mild to moderate tenderness in her back and positive straight leg raises.  (Tr. 630.)  She had abnormal sensation in her left ankle, but normal muscle strength in her thighs and ankles.  (*Id*.)  Dr. Hendrickson determined the etiology of this pain was unclear, and referred Harbolt to pain management.  (*Id*.)

On September 1, 2015, Harbolt returned to Dr. Hendrickson, again complaining of back pain.  (Tr. 625.)  On examination, she had a normal gait, but abnormal station.  (Tr. 623.)  She

14

had mild to moderate tenderness in her back, decreased sensation in her left thigh, and a positive straight leg raise.  (*Id.*)  Dr. Hendrickson prescribed Gabapentin.  (*Id.*)

On October 8, 2015, Harbolt visited Dr. Maged Fouad, M.D., at Comprehensive Pain Management for a pain management consultation.  (Tr. 659.)  On examination, she was not in acute distress, and she rose from a seated position easily.  (Tr. 660.)  She had pain with palpation in her lumbar spine, but negative straight leg raises, normal sensation, and no sacroiliac joint tenderness.  (Tr. 660, 661.)  She had normal motor strength bilaterally, a normal gait, and normal reflexes.  (Tr. 661.)  Dr. Fouad prescribed Percocet and scheduled Harbolt for an injection.  (*Id.*)

Harbolt followed up with Dr. Hendrickson on October 14, 2015, reporting Dr. Fouad had taken over her Percocet prescription.  (Tr. 618.)  Dr. Hendrickson noted Harbolt had an abnormal gait and station, and she was flexed forward.  (Tr. 619.)

Harbolt returned to Dr. Fouad on November 5, 2015.  (Tr. 656.)  She was crying during her office visit, and reported her pain was getting worse.  (Tr. 656, 657.)  On examination, she had no sacroiliac joint tenderness, a normal gait, normal muscle strength, and negative straight leg raises.  (Tr. 657.)  She had a painful range of motion in her lumbar spine.  (*Id.*)  Dr. Fouad prescribed Percocet and referred Harbolt to physical therapy.  (*Id.*)

On December 1, 2015, Harbolt underwent a mental health evaluation with Richard Maroon, PCCS, a counselor in Dr. Fouad's office.  (Tr. 741, 742.)  Harbolt reported she had three good friends, poor sleep, and a history of childhood trauma.  (Tr. 743.)  Based upon this evaluation, Mr. Maroon concluded Harbolt "has issues with substance use (cannabis use), maintains poor coping strategies, and has limited helpful social supports.  Therefore the patient seems to be a high risk for misuse of medication and compliance with treatment

recommendations." (*Id*.)  Mr. Maroon diagnosed Harbolt with generalized anxiety disorder,

PTSD, and cannabis abuse.  (Tr. 742.)  He assigned a GAF score of 50.  (*Id*.)

Harbolt returned to Comprehensive Pain Management on December 2, 2015, and treated

with nurse practitioner Brandy Mansfield, NP.  (Tr. 738.)  Harbolt's cervical spine was tender,

but with a normal range of motion.  (*Id*.)  She had a painful lumbar range of motion, but negative

straight leg raises and a normal gait.  (*Id*.)  At that time, Harbolt admitted she had used marijuana

two weeks prior, and Ms. Mansfield warned Harbolt this was in violation of her pain contract.

(*Id*.)  The next day, on December 3, 2015, Harbolt underwent a lumbar facet medial branch block

injection with Dr. Fouad.  (Tr. 735.)

On December 13, 2015, Harbolt presented to the emergency room with left arm and facial

paresthesia.  (Tr. 830.)  On examination, she had no focal motor deficits and no focal sensory

deficits.  (Tr. 831.)  She underwent a transient ischemic attack ("TIA") and stroke work up,

which was negative.  (*Id*.)  She was admitted for further testing.  (*Id*.)  A brain MRI, head CT

scan, and echocardiogram were all normal.  (Tr. 825, 845.)  Harbolt consulted with a neurologist,

who concluded her symptoms were likely due to a "complicated migraine," with no need for

physical or occupational therapy.  (Tr. 846.)  Harbolt was discharged on December 15, 2015,

with discharge diagnoses of  "left sided numbness and paresthesia of the face and upper

extremity."  (Tr. 845.)

Harbolt was briefly hospitalized from December 21 through December 22, 2015, due to

intractable abdominal pain, nausea, and vomiting during preparation for a colonoscopy.  (Tr.

800.)  Her blood work, abdominal x-ray, and abdominal CT scan were all normal.  (*Id*.)  During

her hospital stay, she underwent a physical therapy assessment, due to multiple falls.  (Tr. 816,

16

818.)  The physical therapist noted Harbolt had a slow and steady step pattern, and issued her a cane.  (Tr. 816, 817.)

Harbolt presented to the emergency room on January 6, 2016, for back and neck pain.  (Tr. 774.)  She explained she had recently been released from her pain management doctor, and her pain was worsening.  (*Id.*)  She was able to ambulate without difficulty in the emergency room.  (*Id.*)  One examination, she had a normal range of motion in her back, with tenderness.  (Tr. 776.)  Her motor strength was normal in her upper and lower extremities, and her gait was normal as well.  (*Id.*)  A CT scan of her neck indicated mild degenerative changes at C4-C5 and C6-C7, while a lumbar spine x-ray indicated moderate degenerative changes.  (*Id.*)  The thoracic spine x-ray revealed an old compression fracture at the T6 level, but no change in the severity of the compression.  (Tr. 783.)  The emergency room doctor advised her to continue her current medication regimen, with ice or heat.  (Tr. 776.)[5]

**C.      State Agency Reports**

**1.        Mental Impairments**

On June 8, 2014, state agency physician Karla Voyten, Ph.D., reviewed Harbolt's medical

---

[5]      In her brief, Harbolt cites to additional evidence which was not before the ALJ for review, but was submitted to the Appeals Council after the ALJ decision.  This evidence includes a February 2016 cervical MRI, a May 2016 EMG, a May 2016 cervical MRI, a July 2016 rheumatologist visit, counseling at Portage Path, and office visits with psychiatrist Dr. Mahilo.  (Tr. 9-14, 55-91,105-106, 877-884.)  The Sixth Circuit has held, when the Appeals Council considers new evidence but denies review, the district court's review is limited to the record available to the ALJ.  *Cline v. Comm'r of Soc. Sec.,* 96 F.3d 146, 148 (6th Cir. 1996).  *See also Elliott v. Apfel,* 28 Fed. App'x 420, 424 (6th Cir. Jan. 22, 2002); *Martin v. Colvin,* 2016 WL 7009167 at *9 (N.D. Ohio Oct. 21, 2016).  As such, the Court will not include these medical records in its recitation of the medical evidence.

records and completed a Psychiatric Review Technique ("PRT") and Mental Residual Functional

Capacity ("RFC") assessment.  (Tr. 225, 228-229.)  She concluded Harbolt had (1) mild

restrictions in activities of daily living; (2) moderate difficulties in maintaining social

functioning; (3) moderate difficulties in maintaining concentration, persistence, or pace; and (4)

no episodes of decompensation.  (Tr. 225.)  With regard to Harbolt's mental functional

limitations, Dr. Voyton found Harbolt was not significantly limited in her abilities to (1) carry

out very short and simple instructions; (2) carry out detailed instructions; (3) perform activities

within a schedule, maintain regular attendance, and be punctual within customary tolerances; (4)

sustain an ordinary routine without special supervision; (5) work in coordination with or in

proximity to others without being distracted by them; (6) make simple work-related decisions;

(7) ask simple questions or request assistance; (8) get along with coworkers or peers without

distracting them or exhibiting behavioral extremes; (9) maintain socially appropriate behavior

and adhere to basic standards of neatness and cleanliness; (10) be aware of normal hazards and

take appropriate precautions; (11) travel in unfamiliar places or use public transportation; and

(12) set realistic goals or make plans independently of others.  (Tr. 228-229.)  She found Harbolt

was moderately limited in her abilities to (1) maintain attention and concentration for extended

periods; (2) complete a normal workday or workweek without interruptions from psychologically

based symptoms and perform at a consistent pace without an unreasonable number and length of

rest periods; (3) interact appropriately with the general public; and (4) respond appropriately to

changes in the work setting.  (*Id.*)  Dr. Voyten explained her conclusions as follows:

> [Claimant] can work in a setting with little or no demand for speed.

> [Claimant] can work with superficial contact with others.

18

[Claimant] can work in a static setting with infrequent changes.

(*Id.*)

On August 28, 2014, state agency physician Irma Johnston, Psy.D., reviewed Harbolt's medical records.  (Tr. 247-248, 250-252.)  She affirmed Dr. Voyten's assessment.  (*Id.*)

### 2.    Physical Impairments

On June 3, 2014, state agency physician Leon D. Hughes, M.D., reviewed Harbolt's medical records and completed a Physical RFC assessment.  (Tr. 226-227.)  Dr. Hughes determined Harbolt could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds; stand and/or walk for about six hours in an eight-hour workday; and sit for about six hours in an eight-hour workday.  (*Id.*)  He further found Harbolt could frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; and frequently stoop, kneel, crouch, and crawl.  (Tr. 227.)

On August 19, 2014, state agency physician Venkatachala Sreenivas, M.D., reviewed Harbolt's medical records.  (Tr. 249-250.)  Dr. Sreenivas adopted the findings of Dr. Hughes, with the additional limitation Harbolt could never climb ladders, ropes, or scaffolds.  (*Id.*)

### D.    Hearing Testimony

During the January 20, 2016 hearing, Harbolt testified to the following:

- She graduated from high school.  (Tr. 190.)  She has a medical assistant certificate.  (Tr. 191.)  She last worked in 2013 at Kmart.  (Tr. 192.)  She stopped working due to pain in her neck and lower back.  (Tr. 193.)

- She lives with a roommate in a two-story house.  (Tr. 189.)  She does not drive due to anger issues and a recent "mini stroke."  (Tr. 190.)  She has three dogs, and she provides care for them, with assistance.  (Tr. 200.)  Her friend bathes the dogs.  (*Id.*)

- She is in constant pain, and spends most of her time in bed.  (Tr. 197.)  She has

19

used a cane to ambulate since December 2015.  (*Id.*)  She can lift 2-3 pounds.
(Tr. 198.)  She can sit for 15-20 minutes before experiencing discomfort in her
lower back.  (*Id.*)  Her neck and back pain radiate down her left leg.  (Tr. 204-
205.)

- She has social anxiety, and does not like to leave her home or be around other
  people.  (Tr. 199.)  She takes medication, which calms her.  (*Id.*)  She has panic
  attacks on a daily basis.  (Tr. 206.)  She does not leave her home by herself.  (Tr.
  204.)  She depends upon her friends and roommate to take her to the grocery
  store and her appointments.  (Tr. 205.)

- She has trouble sleeping at night and is tired during the day.  (Tr. 207.)

- She does not drink alcohol.  She last used marijuana in October 2015.  (Tr. 203.)

The VE testified Harbolt had past work as a solderer, assembler (D.O.T. #813.684-022,

light, SVP 2) and cashier (D.O.T. #211.462-010, light, SVP 2).  (Tr. 208.)  The ALJ then posed

the following hypothetical question:

> This individual can lift and carry occasionally 20 pounds frequently, 10
> pounds, can sit, stand, and walk for up to six hours, can push and pull as
> much as they can lift and carry.  This person can reach overhead frequently
> bilaterally.  This person can frequently climb ramps and stairs, never
> ladders, and scaffolds, and can stoop frequently, kneel frequently, crouch
> frequently, and crawl frequently.  Moreover, this person is limited to
> performing simple, routine tasks, but not at a production rate pace.  This
> person can have occasional interaction with supervisors, coworkers, and the
> public, and can have no more than occasional and routine workplace
> changes.  Lastly, this person would be off task 10 percent of the time in an
> eight hour workday.

(Tr. 209.)

The VE testified the hypothetical individual would not be able to perform Harbolt's past

work as solderer, assembler, or cashier.  (Tr. 210.)  The VE further explained the hypothetical

individual would be able to perform other representative jobs in the economy, such as

housekeeping cleaner (D.O.T. #323.687-014), clerical assistant (D.O.T. #239.567-010), and mail

20

clerk (D.O.T. #209.687-026).  (*Id.*)  The ALJ then posed an additional hypothetical question:

> If I were to start with the first hypothetical I gave you, but limit it, the partial
> limitations as follows – so, the changes that this person can occasionally
> climb ramps and stairs, this person can occasionally stoop, occasionally
> kneel, occasionally crouch, and never crawl, and everything else in
> hypothetical one remains unchanged.

(Tr. 210-211.)  The VE testified his answers would not change with these additional limitations.

(Tr. 211.)

## III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the

time of disability and must prove an inability to engage "in substantial gainful activity by reason

of any medically determinable physical or mental impairment," or combination of impairments,

that can be expected to "result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when

she became disabled; and (3) she filed while she was disabled or within twelve months of the

date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905;

*Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a

claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and

416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of

a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r*

*of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir.

1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Harbolt was insured on her alleged disability onset date, September 14, 2013, and remained insured through December 31, 2017, her date last insured ("DLI.")  (Tr. 163.) Therefore, in order to be entitled to POD and DIB, Harbolt must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.

2.    The claimant has not engaged in substantial gainful activity since September 14, 2013, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.)

3.    The claimant has the following severe impairments: degenerative disc disease of spine multiple levels, fibromyalgia, depression, mood disorder, generalized anxiety disorder, posttraumatic stress disorder and personality disorder (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can push and pull as much as she can lift and carry.  She can reach overhead frequently, bilaterally.  She can never climb ladders or scaffolds and can never crawl.  She can occasionally climb ramps and stairs, stoop, kneel and crouch.  She is limited to simple, routine tasks but not at a production rate pace.  She can have no more than occasional and routine work place changes.  She can have only occasional interaction with coworkers, supervisors and the public.  She would be off task 10% of the time in an 8-hour workday.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on April **, 1966 and was 47 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from September 14, 2013, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 163-175.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to

24

support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing

*Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203

F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion,

the decision of the Administrative Law Judge must stand if the evidence could reasonably

support the conclusion reached.")  This is so because there is a "zone of choice" within which the

Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing

*Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

   In addition to considering whether the Commissioner's decision was supported by

substantial evidence, the Court must determine whether proper legal standards were applied.

Failure of the Commissioner to apply the correct legal standards as promulgated by the

regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281

(6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if

supported by substantial evidence, however, a decision of the Commissioner will not be upheld

where the SSA fails to follow its own regulations and where that error prejudices a claimant on

the merits or deprives the claimant of a substantial right.").

   Finally, a district court cannot uphold an ALJ's decision, even if there "is enough

evidence in the record to support the decision, [where] the reasons given by the trier of fact do

not build an accurate and logical bridge between the evidence and the result."  *Fleischer v.

Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307

(7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If

relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely

overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v.

*Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D.

Ohio July 9, 2010).

## VI.  ANALYSIS

**A.**      **First Assignment of Error: Dr. Mahilo's opinion and GAF scores**

In her first assignment of error, Harbolt argues the ALJ erred in his consideration of the

opinion of Dr. Mahilo and the GAF scores contained in the record.  (Doc. No. 13 at 16.)  Harbolt

asserts while Dr. Mahilo had only examined Harbolt once when she rendered her opinion, "the

record included treatment notes after that date which supported her assessment."  (*Id.*)  As for the

GAF scores, Harbolt maintains the scores were consistent with each other and the treatment

notes.  (*Id.* at 18.)  She argues "these GAF scores were not 'snapshots,' but rather revealed a

psychiatrist's opinion as to the status of his patient throughout the period of time he counseled

and treated her."  (*Id.* at 18, 19.)

The Commissioner maintains the ALJ properly considered and evaluated Dr. Mahilo's

assessment.  (Doc. No. 15 at 18.)  The Commissioner asserts the treatment notes referenced by

Harbolt "were not before the ALJ at the time he rendered his decision," and therefore, "should

have no bearing on the Court's review of whether substantial evidence supported the ALJ's

findings."  (*Id.* at 19.)  The Commissioner also maintains the ALJ appropriately considered the

GAF scores.  (*Id.* at 20.)  She argues even if the ALJ erred in assigning little weight to the GAF

scores, such error is harmless, "as substantial evidence in the record supports the ALJ's

conclusion that [Harbolt] was not rendered unable to work as a result of her mental

impairments."  (*Id.* at 21.)

The Court will address each of Harbolt's arguments, in turn.

26

### 1.      *Dr. Mahilo*

As the Sixth Circuit has explained, "'[t]he Commissioner has elected to impose certain standards on the treatment of medical source evidence.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (citing *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)).  Medical opinions are to be weighed by the process set forth in 20 C.F.R. § 404.1527(c), and "[t]he source of the opinion . . . dictates the process by which the Commissioner accords it weight."  *Id*.  "As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a 'nonexamining source'), *id*. § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly treats the claimant (a 'treating source') is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source'), *id.* § 404.1502, 404.1527(c)(2)."  *Id.*  In other words, "'the regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker.'"  *Gayheart,* 710 F.3d at 375 (quoting Soc. Sec. Rul. No. 96–6p,[6] 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996)).

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Gayheart,* 710 F.3d at

---

[6] SSR 96-6p has been rescinded and replaced by SSR 17-2p, effective March 27, 2017.  *See* Soc. Sec. Rul. No. 17-2p, 2017 WL 3928306 at *1 (Soc. Sec. Admin. Mar. 27, 2017).

376; 20 C.F.R. § 404.1527(c)(2).[7]  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-2p,[8] 1996 SSR LEXIS 9 at *9).  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 581 F.3d at 408.[9]  *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.,* as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'"  *Rogers v. Comm'r of Soc. Sec.*, 486

---

[7] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

[8] SSR 96-2p has been rescinded. This recession is effective for claims filed on or after March 27, 2017.  SSR 96-2p, 2017 WL 3928298 at *1.

[9] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

F.3d 234, 242 (6thCir. 2007) (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5).  *See also Gayheart*, 710 F.3d at 376.

However, in order to be considered a treating source, the physician must have "an ongoing treatment relationship with" the claimant, and the frequency of treatment must be "consistent with accepted medical practice" for the claimant's condition.  20 C.F.R. §§ 404.1502 and 416.902.  *See Reeves v. Comm'r of Soc. Sec.*, 618 Fed. App'x  267, 273 (6th Cir. July 13, 2015).  Precedent in this Circuit suggests a physician who treats an individual only twice or three times does not constitute a treating source.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x  496,  506–07 (6th Cir. 2006) ("Depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship"); *Kepke v. Comm'r of Soc. Sec.*, 636 Fed. App'x 625, 629 (6th Cir. 2016) ("It was not improper for the ALJ to discount Dr. Chapman's opinion on the basis that he treated Kepke only three times over a three month period); *Mireles ex rel. S.M.M. v. Comm'r of Soc. Sec.*, 608 Fed. App'x 397, 398 (6th Cir. 2015); *Helm v. Comm'r of Soc. Sec. Admin.*, 405 Fed. App'x 997, 1000–01 n. 3 (6th Cir. 2011.)  *See also Fleischer,* 774 F.Supp.2d at 879; *Pethers v. Comm'r of Soc. Sec.*, 580 F.Supp.2d 572, 579 n .16 (W.D. Mich.2008); *Carter v. Berryhill*, 2017 WL 2544064 at * 9 (N.D. Ohio May 26, 2017), *report and recommendation adopted by* 2017 WL 2537066 (N.D. Ohio June 12, 2017); *Witnik v. Colvin,* 2015 WL 691329 at * 7 (N.D. Ohio Feb. 18, 2015); *Hickman v. Colvin*, 2014 WL 2765670 at * 12 (M.D. Tenn. June 18, 2014), *report and recommendation adopted by* 2014 WL 3404967 (M.D. Tenn. July 10, 2014).

Here, the ALJ determined, at step two, that Harbolt had the severe impairments of degenerative disc disease, fibromyalgia, depression, mood disorder, generalized anxiety disorder,

PTSD, and personality disorder.  (Tr. 163.)  After finding Harbolt's impairments did not meet or

equal the requirements of a Listing, the ALJ proceeded to consider the medical evidence

regarding Harbolt's physical and mental impairments at step four.  (Tr. 164-170.)

       The ALJ then considered the medical opinion evidence.  (Tr. 173-174.)  The ALJ

analyzed Dr. Mahilo's opinion as follows:

> As for the medical source assessment provided by Meredith Mahilo, M.D.
> on January 21, 2016, I gave her statement little weight (Ex. 19F).  While
> Dr. Mahilo's findings that the claimant did not have frequent limitations in
> functioning are generally supported by the overall record, I give Dr.
> Mahilo's assessment little weight because she performed only a onetime
> examination of the claimant.  Further, despite Dr. Mahilo's findings that the
> claimant had no observable limitations, she went on to find that the
> claimant would be absent two days per month and would require
> unscheduled breaks about one time per day.  These findings contradict her
> findings of no observable limitations.  While Dr. Mahilo reasons that, the
> claimant suffers from panic attacks a "few times per month" her assessment
> is based on the claimant's subjective statements and not her objective
> examination.  Furthermore, Dr. Mahilo reported that the claimant's
> medication allowed her to function to meet her needs with minimal
> interruptions or absences, which is not consistent with absences twice per
> month.  Therefore, Dr. Mahilo's assessment is given little weight.

(Tr. 173.)

       The ALJ formulated the following RFC:

> After careful consideration of the entire record, I find that the claimant has
> the residual functional capacity to perform light[10] work as defined in 20

---

[10]    "Light work" is defined as follows: "Light work involves lifting no more than 20
pounds at a time with frequent lifting or carrying of objects weighing up to 10
pounds. Even though the weight lifted may be very little, a job is in this category
when it requires a good deal of walking or standing, or when it involves sitting
most of the time with some pushing and pulling of arm or leg controls. To be
considered capable of performing a full or wide range of light work, you must
have the ability to do substantially all of these activities." 20 CFR § 404.1567(b).
Social Security Ruling 83–10 clarifies that "since frequent lifting or carrying
requires being on one's feet up to two-thirds of a workday, the full range of light

> CFR 404.1567(b) and 416.967(b) except she can push and pull as much as she can lift and carry. She can reach overhead frequently, bilaterally. She can never climb ladders or scaffolds and can never crawl. She can occasionally climb ramps and stairs, stoop, kneel, and crouch. She is limited to simple, routine tasks but not at a production rate pace. She can have no more than occasional and routine workplace changes. She can have only occasional interaction with co-workers, supervisors, and the public. She would be off task 10% of the time in an 8-hour workday.

(Tr. 166.)

Before the Court reaches the question as to whether the ALJ complied with the "treating physician rule," it must first determine whether Dr. Mahilo constitutes a treating source. *Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) (citing *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007)).

For the following reasons, the Court finds Dr. Mahilo does not constitute a treating source, and therefore her opinion is not subject to the "treating physician rule." Dr. Mahilo personally examined Harbolt on only one occasion prior to her January 2016 examination. In her opinion, she specifically noted her findings were "limited to a single psychiatric evaluation." (Tr. 876.) She stressed "is it relevant I have only had one interaction with this patient for an evaluation, and can only make an assessment based on one encounter." (*Id.*) This one time encounter does not establish the ongoing treatment relationship necessary to be considered a treating source. *See Smith*, 482 F.3d at 876. *See also Punches v. Comm'r of Soc. Sec.,* 2013 WL 3992593 at *3 (N.D. Ohio Aug. 5, 2013) ("The case law is clear that one examination is generally not sufficient to establish an ongoing relationship at the time of that examination.").

Harbolt directs this Court's attention to Dr. Mahilo's subsequent treatment notes,

---

work requires standing or walking, off or on, for a total of approximately six hours of an 8–hour workday." SSR 83–10, 1983 WL 31251 (1983).

arguing they provide support for Dr. Mahilo's assessment.  (Doc. No. 13 at 16.)  However, these treatment notes were not available for the ALJ's consideration, but were new evidence Harbolt submitted to the Appeals Council.  (Tr. 181, 877-882.)  The Sixth Circuit has held, when the Appeals Council considers new evidence but denies review, the district court's review is limited to the record available to the ALJ.  *Cline v. Comm'r of Soc. Sec.,* 96 F.3d 146, 148 (6th Cir. 1996).  *See also Elliott v. Apfel,* 28 Fed. App'x 420, 424 (6th Cir. Jan. 22, 2002); *Martin v. Colvin,* 2016 WL 7009167 at *9 (N.D. Ohio Oct. 21, 2016).

Moreover, the inquiry into a physician's treating source status considers only the physician's relationship with the claimant *at the time the opinion was rendered.  Kornecky ,* 167 Fed. App'x at 506 (6th Cir. Feb. 9, 2006)(emphasis added).  The fact Dr. Mahilo may have seen Harbolt several more times *after* offering her opinion is not relevant to establishing whether Dr. Mahilo constitutes a treating source for purposes of weighing her opinion.

As Dr. Mahilo was not Harbolt's treating physician at the time of the January 2016 opinion, the ALJ was not required to determine whether her opinion was entitled to "controlling weight," or articulate "good reasons" for discounting Dr. Mahilo's opinion.  Moreover, as noted *supra*, the record before the ALJ did not include any of Dr. Mahilo's treatment records.  The only piece of evidence relating to Dr. Mahilo is her January 2016 opinion.  (Tr. 874-876.)  This opinion essentially finds no limits for Harbolt in most areas, but then concludes she would require excessive absences and breaks.  (Tr. 874-875.)  Dr. Mahilo does provide one specific medical finding within her opinion, noting Harbolt had a normal mental status examination.  (Tr. 876.)  She then concludes her "assessment is based on a history of her panic attacks, which are infrequent and self reported as a few times a month with limited impairment."  (*Id.*)  In the

32

absence of any actual medical records relating to Dr. Mahilo's treatment of Harbolt, and the fact it appears the limits provided are based upon Harbolt's subjective reports, the Court finds the ALJ reasonably afforded Dr. Mahilo's January 2016 opinion little weight.

### 2.     GAF scores

A GAF score is a "subjective rating of an individual's overall psychological functioning" which may assist an ALJ in formulating an RFC.  *Kennedy v. Astrue,* 247 Fed. App'x 761, 766 (6th Cir. Sept. 7, 2007).  The Sixth Circuit has held GAF scores are not "essential to the RFC's accuracy," and directs courts to take a "case-by-case approach to the value of GAF scores." and *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 836 (6th Cir. 2016). Specifically, the Sixth Circuit has explained:

> We take a case-by-case approach to the value of GAF scores.  Previously, we have refused to find that a low GAF score established that the ALJ's decision was not supported by substantial evidence where the ALJ had reason to doubt the credibility of the assigning source; the claimant had conflicting GAF scores; the GAF scores were not accompanied by a suggestion that the claimant could not perform any work; substantial evidence supported the conclusion that the claimant was not disabled; and the VE testified that an individual with the claimant's limitations could still perform a number of jobs.  *See Kornecky*, 167 Fed.Appx. 496, 511 (6th Cir.2006).  On the other hand, we have looked to consistency among low GAF scores to determine that an ALJ minimized the severity of a claimant's symptoms and failed to provide good reasons for assigning limited weight to a treating doctor's opinion.  *See Keeton*, 583 Fed.Appx. at 529–30, 530 n. 6.  We have also looked to the inconsistency between one doctor's assigned GAF score and a different doctor's opinion as a proper basis for rejecting the latter doctor's opinion.  *See Gribbins v. Comm'r of Soc. Sec. Admin.*, 37 Fed.Appx. 777, 779 (6th Cir.2002).

*Id.*

While the Sixth Circuit has acknowledged GAF scores may be helpful, an ALJ is not required to place any "particular amount of weight" on a GAF score.  *See Johnson v. Comm'r of*

33

*Soc. Sec.*, 535 Fed. App'x 498, 508 (6th Cir. Oct. 15, 2013).  *See also Howard v. Comm'r of Soc.*

*Sec.,* 276 F.3d 235, 241 (noting that a GAF "is not essential to the RFC's accuracy"); *Keeler v.*

*Comm'r of Soc. Sec.*, 511 Fed. App'x 472, 474 (6th Cir. Jan. 11, 2013) (stating that "the ALJ was

not required to consider Keeler's GAF score").  Indeed, the Sixth Circuit has "held that the failure

to reference a [GAF] score is not, standing alone, sufficient ground to reverse a disability

determination." *DeBoard v. Comm'r of Soc. Sec.,* 211 Fed. App'x 411, 415 (citing *Howard*, 276

F.3d at 241).

Here, Harbolt received GAF scores from four sources: Megan Yetzer, M.A., Shandi

Olminsky, LSW, Lila Jenkins, CNP, and Bradley Winkhart, M.D.  (Tr. 429, 485, 489, 527.)

Three of the sources assigned Harbolt a score of 45,[11] while Ms. Yetzer assigned Harbolt a score

of 51.  (*Id.*)  Notably, Dr. Winkhart assigned Harbolt a GAF score of 45 each time he saw her for

treatment.  (Tr. 527, 521, 732, 726, 720, 713.)

The ALJ discussed these GAF scores in the decision as follows:

> As for the numerous GAF scores in the record, I give them little weight
> (Ex. 1F; 4F; 6F; 11F; 13F).  A GAF score is a subjective assessment by an
> examiner.  Various factors including the claimant's own subjective
> complaints are considered when determining a GAF score.  Further, a GAF
> score is a "snapshot" of the claimant and does not provide a longitudinal
> view of the claimant.  Due to the lack of probative value, the GAF scores
> are given little weight.

(Tr. 173.)

The Court finds the ALJ properly considered the GAF scores contained in the record.

---

[11]     A GAF score between 41 and 50 indicates serious symptoms or any serious
impairment in social, occupational or school functioning.  *See Diagnostic and
Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric
Ass'n, 5th ed., 2013).

Harbolt argues the consistency of the GAF scores should have been given greater consideration by the ALJ, citing *Miller v. Comm'r of Soc. Sec.,* 811 F.3d 825 (6th Cir. 2016).  (Doc. No. 13 at 18, Doc. No. 16 at 3.)  However, the mere existence of consistent GAF scores does not provide evidence the ALJ erred when discounting them.  *Sarp v. Comm'r of Soc. Sec.,* 2017 WL 1365414 at *6 (E.D. Mich. Apr. 14, 2017).  The Court acknowledges the Sixth Circuit, in *Miller,* did find an ALJ improperly assigned limited weight to several consistent GAF scores.  *Miller,* 811 F.3d at 837.  The Court finds *Miller* distinguishable.  The Court in *Miller* found the ALJ erred due to specific reasons on top of the existence of consistent GAF scores, including the ALJ's mischaracterization of the evidence and reliance on "choice excerpts" from the record.  *Id.*

Here, unlike *Miller*, the ALJ properly reviewed and considered the mental health evidence and treatment notes.  He discussed Harbolt's treatment at Portage Path, and noted her counselors' findings, including a depressed and anxious mood and mildly impaired concentration.  (Tr. 167.)  He noted she switched to Coleman Professional Services for mental health treatment in May 2014.  (*Id.*)  He discussed the examiner's findings during Harbolt's assessment, including her anxious mood, and reports of memory deficits.  (*Id.*)  He also discussed, at length, the wide range of daily activities she had reported to her mental health treatment providers.  (*Id.*)  The ALJ then continued to discuss the objective findings in her mental health treatment notes, including a logical thought processes, and reports of an improved condition.  (Tr. 168.)  The ALJ did not mischaracterize these treatment notes, and in fact, acknowledged those portions of the treatment notes indicating some degree of limitation.

Harbolt asserts the "ALJ failed to consider any evidence submitted after the State Agency medical consultants reviewed the file in 2014."  (Doc. No. 16 at 4.)  A review of the

35

decision indicates this is inaccurate.  The ALJ specifically discussed treatment notes from Coleman Professional Services dated October 2014 and May 2015, which both occurred after the last state agency review in August 2014.  (Tr. 168.)

Following his discussion of Harbolt's mental health treatment, the ALJ provided a well-reasoned explanation for affording the GAF scores little weight.  He explained GAF assessments are often based upon subjective complaints, and the scores were a "snapshot" of Harbolt at the time of the assessment.  (Tr. 173.)  This explanation is reasonable, particularly given the 2013 update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

Moreover, substantial evidence supports the ALJ's conclusions.  Harbolt began to receive mental health treatment at Portage Path Behavioral Health in November 2013.  (Tr. 420.) She reported daily panic attacks, poor sleep, inattention, and suicidal ideation.  (Tr. 420, 421, 423.)  However, she also indicated she read for pleasure, did her laundry, and enjoyed cooking and baking.  (Tr. 427.)  She also was able to travel to Florida to visit her daughter.  (Tr. 435.) While she indicated her medication was not working in March 2014, she was not taking the correct dosage.  (Tr. 444.)

Harbolt then switched mental health providers in May 2014, and began to treat at Coleman Professional Services.  She reported anxiety, a fear of leaving her home, and poor sleep. (Tr. 467.)  However, she also indicated she had several friends she visited on a regular basis.  (Tr. 469, 474.)  In July 2014, she was still depressed, but her sleep had improved.  (Tr. 496.)  In September 2014, she indicated her antidepressant was helping her depression.  (Tr. 543.)  Shortly

thereafter, she discontinued her medications, and reported racing thoughts and poor sleep. (Tr. 518, 519.) Harbolt then resumed her medications. In December 2014, she indicated to her psychiatrist, Dr. Winkhart, the medications were helpful. (Tr. 730.)

Harbolt continued to see Dr. Winkhart in 2015. She reported anxiety, however, she also found her medications helpful. (Tr. 711.) In December 2015, she again changed mental health providers, and began to see Dr. Mahilo. During Dr. Mahilo's initial assessment, Harbolt had a normal mental status examination. (Tr. 876.) These treatment notes indicate that while Harbolt did consistently experience depression and anxiety, she was improved on medications, and was still able to socialize with others and conduct household tasks. Thus, the ALJ's conclusion to afford the low GAF scores little weight is supported by substantial evidence.

As substantial evidence supports the ALJ's conclusions, this Court cannot disturb the ALJ's findings simply because of the existence of consistently low GAF scores. *See Kornecky,* 167 Fed. App'x at 511 (finding that if substantial evidence exists to support the ALJ's conclusion, remand is not warranted where the claimant had consistently received GAF scores ranging from 40-46).

Accordingly, and for the reasons set forth above, the Court finds the ALJ properly evaluated both Dr. Mahilo's opinion and Harbolt's GAF scores. Harbolt's first assignment of error is without merit.

**B.      Second Assignment of Error: Credibility**

In her second assignment of error, Harbolt argues the ALJ did not properly evaluate her credibility. (Doc. No. 13 at 20.) She asserts the ALJ "disregarded any objective testing in the record which supported [her] testimony regarding her disabling pain." (*Id.*) She maintains the

37

ALJ inaccurately described her activities of daily living, and "played doctor when he made

suppositions and conclusions contrary to [her] testimony and the findings contained in the

treatment notes of the treating physicians in this matter. (*Id*. at 22.)

The Commissioner asserts the ALJ properly assessed Harbolt's subjective complaints.

(Doc. No. 15 at 11.)  She argues the ALJ accurately noted several inconsistencies in the record,

"which detracted from the credibility of [Harbolt's] complaints." (*Id.* at 12, 13.)  The

Commissioner further notes the opinions of the state agency physicians "further support the

ALJ's conclusion that [Harbolt] was capable of a range of light exertional level work despite her

physical impairments." (*Id*. at 15.)  She concludes the ALJ "specifically and expressly"

discussed the diagnostic testing and objective findings in the decision cited by Harbolt, and "the

overall record supported" the ALJ's conclusion. (*Id*. at 16.)

It is well settled that pain alone, if caused by a medical impairment, may be severe

enough to constitute a disability. *See Kirk v. Sec' of Health and Human Servs*., 667 F.2d 524,

538 (6th Cir. 1981), cert. denied, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983).  When a

claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for

evaluating these symptoms. *See e.g, Massey v. Comm'r of Soc. Sec.,* 2011 WL 383254 at * 3 (6th

Cir. Feb. 7, 2011).  First, the ALJ must determine if there is an underlying medically

determinable physical or mental impairment that could reasonably be expected to produce a

claimant's symptoms.  Second, the ALJ "must evaluate the intensity and persistence of [the

claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the

claimant's] capacity for work."  20 C.F.R. § 404.1529(c)(1). *See also* SSR 96–7p, 1996 WL

374186 (July 2, 1996).[12]  Essentially, the same test applies where the alleged symptom is pain, as

the Commissioner must (1) examine whether the objective medical evidence supports a finding

of an underlying medical condition; and, if so, (2) whether the objective medical evidence

confirms the alleged severity of pain arising from the condition or whether the objectively

established medical condition is of such a severity that it can reasonably be expected to produce

the alleged disabling pain.  *Duncan v. Secretary of Health & Human Services*, 801 F.2d 847, 853

(6th Cir. 1986).  *See also Felisky v. Bowen*, 35 F.3d 1027, 1038–39 (6th Cir. 1994); *Pasco v.*

---

[12]     SSR 16-3p supercedes SSR 96-7p, 1996 WL 374186 (July 2, 1996), which was in
effect at the time of the February 19, 2016 hearing.  Both Harbolt and the Commissioner
suggest that SSR 96-7p governs this case.  This Court has previously decided, in
dicta, to apply SSR 16-3p retroactively.  *See e.g., Anderson v. Berryhill*, 2017 WL
1326437 at fn 3 (N.D. Ohio March 2, 2017).  Here, the parties do not address SSR
16-3p's application.  District courts within this Circuit have disagreed regarding the
retroactivity of SSR 16-3p and the Sixth Circuit has not decided the issue. *See Sypolt v.
Berryhill*, 2017 WL 1169706 at fn 4 (N.D. Ohio March 8, 2017) (applying SSR 16-3p
retroactively); *Clayton v. Comm'r of Soc. Sec.*, 2016 WL 5402963 at * 6 (E.D. Mich.
Sept. 28, 2016) (applying SSR 16-3p but not directly addressing issue of retroactivity);
*Carpenter v. Comm'r of Soc. Sec.*, 2017 WL 1038913 at * 11 (N.D. Ohio March 17,
2017) (applying SSR 16-3p but not directly addressing issue of retroactivity).  *But see
Murphy v. Comm'r of Soc. Sec.*, 2016 WL 2901746, at n.6(E.D. Tenn. May 18, 2016)
(declining to apply SSR 16-3p retroactively); *Withrow v. Comm'r of Soc. Sec.*, 2016 WL
4361175 at fn 5 (S.D. Ohio Aug. 16, 2016) (same); *Richards v. Comm'r of Soc. Sec.*,
2017 WL 892345 at fn 5 (E.D. Mich. Feb. 16, 2017);*Davis v. Astrue*, 2016 WL 5957616
at fn 2 (W.D. Tenn. Oct. 14, 2016) (same); *Baker v. Comm'r of Soc. Sec.*, 2016 WL
4361174 at fn 2 (S.D. Ohio Aug. 16, 2016); *Scott v. Berryhill*, 2017 WL 875480 at fn 7
(E.D. Ky. March 3, 2017).  The Sixth Circuit, while declining to reach the retroactivity
issue, has characterized SSR 16-3p as merely eliminating "the use of the word
'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an
individual's character.' " *Dooley v. Comm'r of Soc. Sec.,* 656 Fed. Appx. 113, 119 n.1 (6th
Cir. 2016).  The Court perceives the issue to be largely academic here; neither party
makes any argument that applying SSR 16-3p over SSR 96-7p would change the
outcome.  As discussed above, the ALJ evaluated Harbolt's complaints against the
objective medical evidence and did not judge Harbolt's character.  In any event, the
Court's evaluation of Harbolt's credibility argument herein would be the same applying
either SSR 16-3p or SSR 96-7p.

*Comm'r of Soc. Sec.*, 137 Fed. Appx. 828, 834 (6th Cir. June 23, 2005).

 If these claims are not substantiated by the medical record, the ALJ must make a credibility determination of the individual's statements based on the entire case record. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) ("noting that "credibility determinations regarding subjective complaints rest with the ALJ").  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly.  *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight."  SSR 96–7p, Purpose Section, 1996 WL 374186 (July 2, 1996); *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").[13]

 To determine credibility, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record.  *See* 20 C.F.R. §404.1529; SSR 96–7p, Purpose, 1996 WL 374186 (July 2, 1996).

---

[13] SSR 16-3p similarly provides that an ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  SSR 16-3p, 2016 WL 1119029 at *9.

Beyond medical evidence, there are seven factors that the ALJ should consider.[14]  The ALJ need

not analyze all seven factors, but should show that he considered the relevant evidence.  *See*

*Cross*, 373 F. Supp.2d at 733; *Masch v. Barnhart*, 406 F. Supp.2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ acknowledged Harbolt's testimony and written statements regarding her

chronic pain, social anxiety, and panic attacks.  (Tr. 166.)  He noted she testified she can lift 2-3

pounds, sit for 15-20 minutes, has daily panic attacks, does not leave her home, and must use a

cane due to left leg nerve pain.  (*Id.*)  The ALJ then provided a 5-page discussion of Harbolt's

treatment records, the objective findings on examination, her activities of daily living, the

medical opinion evidence, and the GAF scores.  (Tr. 166-171.)  The ALJ determined Harbolt's

medically determinable impairments could reasonably be expected to cause the alleged

symptoms; however, the ALJ found her statements concerning the intensity, persistence, and

limiting effects of those symptoms were not entirely credible.  (Tr. 171.)

The ALJ then proceeded to lay out a detailed evaluation of Harbolt's allegations and

credibility:

---

[14]    The seven factors are: (1) the individual's daily activities; (2) the location,
duration, frequency, and intensity of the individual's pain; (3) factors that
precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and
side effects of any medication the individual takes or has taken to alleviate pain or
other symptoms; (5) treatment, other than medication, the individual receives or
has received for relief of pain or other symptoms; (6) any measures other than
treatment the individual uses or has used to relieve pain or other symptoms; and
(7) any other factors concerning the individual's functional limitations and
restrictions due to pain or other symptoms.  *See* SSR 96–7p, Introduction and SSR
16-3p, 2016 WL 1119029 at * 7; *see also Cross v. Comm'r of Soc. Sec*., 373
F.Supp.2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified
statement, should explain his or her credibility findings in terms of the factors set
forth in the regulations, thereby permitting the court to "trace the path of the
ALJ's reasoning.")

41

In terms of the claimant's alleged limitations, I find the claimant is only partially credible.  For example, the claimant testified needing an assistive device to get out of bed and ambulate due to back pain; however, the record reveals that the cane was prescribed in December 2015 for reported balance deficits related to her "mini stroke."  The claimant was not prescribed a cane due to back pain as the claimant alleged, which suggests her providers did not feel her back pain presented such severe limitations that required the use of an assistive device.  While the claimant complained of constant neck and back pain, the record demonstrates she was often found to be in no acute distress.  Furthermore, while she alleged significant limitations including being limited to lifting only 2-3 pounds and sitting for 15-20 minutes, the record demonstrates that the objective record has been relatively tame.  In fact, review of the record reveals objective findings have been limited to decreased range of motion, tenderness, occasional decreased sensation or reflexes and only occasional gait deficits.  Overall, the record demonstrates the claimant has typically been observed to be ambulating independently with a normal gait, exhibiting normal reflexes, no sensory deficits and no atrophy.  The record demonstrates the claimant acknowledged she was independent in her ability to perform personal care needs.  In addition to her ability to perform personal care needs, the record demonstrates she was able to assist with household chores, cook, grocery shop, care for her dogs, travel to Florida and seek medical attention.

The record demonstrates that the claimant has a diagnosis of fibromyalgia and her providers have recommended the claimant stay active and engage in physical therapy.  Despite these recommendations, the record demonstrates the claimant has continued to request and rely on narcotic medication including Percocet while smoking marijuana.  The record reveals that the claimant was routinely advised to cease cigarette smoking and the use of marijuana; however, the record reveals that as recent as December 2015, she reported she continued to use marijuana and furthermore that she has not quit smoking.  The claimant's failure to follow her providers' recommendations hinders her credibility.  Further hindering her credibility is her failure to be candid with the court regarding her last use of marijuana.  While the claimant testified she last used marijuana in October 2015, the record reveals she reported marijuana use as recent as December 2015.  Moreover, the record demonstrates that at times the claimant has been demanding, especially toward emergency room staff when not given narcotic medication.  For example, in May 2015 despite examiners finding "no real injury" and the claimant reported that she had been lifting her dogs into the bathtub, the claimant stated she was in too much pain, requested Percocet and stated she was getting angry and would freak out.  Additionally, when her provider reduced the number of Percocet she needed to take, the claimant ignored her provider and continued to take

Percocet at higher does[sic], stated that she 'knew the way her body wants her to' take the medication.

Furthermore, while physical examination has revealed tenderness related to her fibromyalgia, the overall objective findings do not support the claimant's allegations of the intensity, persistence, and impact on her functioning.  These mild to moderate finding[s] do not[t] support an inability to lift more than 3 pounds, sit for more than 20 minutes, or stand long enough to do dishes.  Despite the claimant testifying that, her pain was constant, at the hearing she was observed to be capable of sitting well over 20 minutes.  Even after sitting for well over 20 minutes, she continued to respond appropriately to questioning and did not exhibit pain behavior.  Despite the claimant's testimony, the record lacks a statement from her provider restricting her to lifting no more than 3 pounds.  Moreover, the record lacks objective support that the claimant would need to lie down throughout the day.  She has reported insomnia and trying to nap during the day; however, she has not appeared to be fatigued, tired or lacking concentration.

Regarding her mental impairments, the record demonstrates the claimant has sought treatment for anxiety and depression.  Despite seeking treatment for these impairments, the record reveals that she has failed to be compliant with her medication.  The record demonstrates that the claimant frequently failed to take her prescribed medication for various reasons including forgetting.  Moreover, the record demonstrates that when the claimant was taking her medication as prescribed, such as in May 2015, the claimant reported improvement in her anger and anxiety.  While she testified she did not drive and her counselor recommend she not drive due to becoming angry, emergency room records often revealed the claimant left the emergency room by herself.  This suggests the claimant often felt comfortable enough to drive herself despite her various reported symptoms.  Furthermore, the claimant testified she had panic attacks once a day, however, the record reveals she reported panic attacks twice a month.  The claimant's inconsistent statements do not support her allegations and hinders her credibility.

Moreover, she was found to be appear anxious, tearful, and irritable at times, however she was typically groomed appropriately and reported activities such as visiting with friends, taking care of her dogs, walking and visiting her daughter in Florida.  As noted above the record fails to support her testimony that she required prescribed medication to visit her daughter in Florida.  Furthermore, while she frequently reported isolating herself, she also reported she enjoyed being alone, suggesting her "isolation" was not solely due to her psychological symptoms.  The claimant reported deficits

43

in attention and concentration; however, these were predominately
subjective in natures[sic], since the record reveals she was frequently found
to have good attention and concentration.  I note that despite reporting a
history of severe anxiety since 2011, the claimant continued to work as a
cashier nonetheless.  While the claimant testified she quit working due to
pain in her neck and back, the record demonstrates that she reported to her
provider that she quit working due to a conflict with coworkers, suggesting
that if the claimant had not been in conflict with coworkers she would have
continued working.

(Tr. 171-173.)

Substantial evidence supports the ALJ's credibility determination.  MRIs and x-rays
have indicated mild to moderate degenerative changes, with no significant stenosis.  (Tr. 547,
597, 633, 634, 776.)  While she reported very high levels of pain to her physicians, examination
findings often indicated no joint swelling, normal range of motion in her joints, a normal gait,
and full muscle strength.  (Tr. 545, 543, 630, 640, 661.)

As for her mental impairments, Harbolt often reported anxiety and panic attacks.  (Tr.
421, 444, 467.)  However, she inconsistently took her prescribed medications.  (Tr. 417, 444,
472, 518.)  She also was able to travel to Florida to visit her daughter and indicated she regularly
socialized with friends.  (Tr. 432, 469, 474.)  She switched mental health providers multiple
times during the relevant period, and her most recent provider, Dr. Mahilo, noted a normal
mental status examination.  (Tr. 876.)

Harbolt argues the ALJ disregarded the diagnostic testing and the abnormal examination
findings which supported her allegations of pain.  (Doc. No. 13 at 19, 20.)  She notes the x-rays
contained in the record, which revealed mild to moderate findings, along with an old
compression fracture.  (*Id*.)  Harbolt fails to explain why mild to moderate degenerative changes
in her spine support greater limitations than assessed by the ALJ.  Indeed, the ALJ discussed

each of these x-rays, and acknowledged their findings.  (Tr. 168, 169, 171.)  He then limited

Harbolt to light work, and specifically noted "due to mild degenerative disc disease in the

cervical spine, she is limited to only frequent overhead reaching bilaterally."  (Tr. 173.)

As for the abnormal examination findings, Harbolt directs this Court's attention to

several treatment notes, which indicate decreased or abnormal sensation, tenderness, decreased

strength, and abnormal gait.  (Doc. No. 13 at 19.)  She argues these "findings provided objective

support for [her] allegations of disabling pain in her neck and back."  (*Id*.)  While it is true

Harbolt did have some positive findings during her physical examinations, she also has had

multiple office visits where she had normal sensation, negative straight leg raises, normal motor

strength, and a normal gait.  (Tr. 543, 619, 623, 630, 657,661, 738.)  Moreover, the ALJ

acknowledged several of these positive findings in his decision, and limited her accordingly.  (Tr.

169-170.)  It is unclear how Harbolt comes to the conclusion the ALJ "disregarded" the objective

evidence contained in the record, when the ALJ specifically noted the objective findings, and

accounted for them in the RFC.  (*See* Doc. No. 13. at 20.)

Harbolt also objects to the ALJ's discussion of several inconsistencies in the record.

These include (1) her use of a cane; (2) her activities of daily living; (3) why she left her prior

job; and (4) her ability to sit at a hearing for 20 minutes.  (Doc. No. 13 at 21, 22, Doc. No. 16 at

1, 2.)  In evaluating credibility, an ALJ may consider the consistency of a claimant's statements

"both internally, and with other information in the case record."  SSR 96–7p,1996 WL 374186 at

*5 (July 2, 1996).  Further, an ALJ "must compare statements made by the individual in

connection with his or her claim for disability benefits with statements he or she made under

other circumstances, when such information is in the case record."  *Id*.

45

The ALJ appropriately considered the inconsistencies contained in the record when weighing her credibility.  As noted by the ALJ, Harbolt provided two different explanations as to why she stopped working, citing back pain at the hearing and then reporting a fear of a co-worker to her counselor.  (Tr. 417, 192-193.)  As for her cane use, Harbolt testified she uses a cane due to back pain radiating down her leg and requires it to ambulate and get out of bed.  (Tr. 197, 205.)  However, she also testified she began to use a cane after her December 2015 "mini stroke."  (Tr. 197.)  A review of her physical therapy record indicates she received the cane during a brief hospitalization for nausea.  (Tr. 800, 816.)

Harbolt argues the ALJ's description of her daily activities is "inaccurate."  (Doc. No. 13 at 22.)  The Court disagrees.  The ALJ noted Harbolt can assist with household chores, cook, grocery shop, care for her dogs, and travel to Florida.  (Tr. 171.)  Harbolt testified at the hearing she needs a great deal of assistance to perform any of these activities.  (Tr. 200, 201, 205.)  However, Harbolt reported earlier, in her application for disability, she could cook, perform household chores, shop in stores alone, and drive.  (Tr. 362, 363.)  The ALJ was not required to accept the explanations Harbolt provided at the hearing regarding her activities of daily living.

Harbolt then unsuccessfully argues her ability to sit for longer than 20 minutes at the hearing "should not have discounted the opinion of Dr. Kaforey[15] regarding her shoulder pain and physical limitations regarding weight restrictions for lifting and carrying."  (Doc. No. 16 at 2.) However, this is not how the ALJ analyzed these pieces of evidence.  The ALJ noted Harbolt's ability to sit for over 20 minutes in the hearing without exhibiting pain behavior.  (Tr.

---

[15]    Harbolt makes no argument the ALJ erred in assigning emergency room physician Dr. Kaforey's opinion little weight.

46

172.)  Then, several paragraphs later, he afforded Dr. Kaforey's opinion little weight, based upon the mild objective findings.  (Tr. 173.)  It is unclear why Harbolt asserts the ALJ "discounted" Dr. Kaforey's opinion based upon his observations in the hearing.

While Harbolt urges this Court to reject the ALJ's analysis of the inconsistencies in the evidence, it is not this Court's role to "reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. App'x 411, 414 (6th Cir. Apr. 1, 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)). *See also Vance v. Comm'r of Soc. Sec.*, 260 Fed. App'x 801, 807 (6th Cir. Jan. 15, 2008) (stating that "it squarely is not the duty of the district court, nor this court, to re-weigh the evidence, resolve material conflicts in testimony, or assess credibility.")

In sum, the ALJ considered a number of factors in assessing Harbolt's credibility, including her diagnostic testing, the effectiveness of her treatment, the objective findings upon examination, and the inconsistencies contained in the record.  These factors are supported by the evidence in the record and are sufficiently specific to make the basis of the ALJ's credibility analysis clear.

Accordingly, the Court finds substantial evidence supports the ALJ's credibility assessment.  This assignment of error is without merit.

### C. Third Assignment of Error: Step Five/Grid Rules

In her third assignment of error, Harbolt argues the ALJ "did not meet his burden at step five of the sequential evaluation."  (Doc. No. 13 at 22.)  She asserts the ALJ "did not properly evaluate the cumulative effects of [her] impairments," particularly her use of a cane.  (*Id.* at 23.)

Harbolt maintains that since she was 49 years old at the time of the hearing, the ALJ should have applied the age categories "non-mechanically" and found her disabled based on the "grid rules." (*Id*. at 23, 24.)  Harbolt contends, in the alternative, she "should have been found disabled as of her fiftieth birthday."  (*Id*. at 24.)

The Commissioner maintains since the ALJ provided the VE with a "properly formulated hypothetical question" and therefore, the VE testimony "constitutes substantial evidence supporting the ALJ's step five finding."  (Doc. No. 15 at 22.)  The Commissioner asserts Harbolt appears to be arguing "*had* the ALJ concluded that she required the use of a cane, and further *had* the ALJ thus concluded that she was capable of only sedentary exertional level work, the ALJ should have applied the Grids to find her disabled because she turned 50 years old two months after the ALJ's decision."  *(Id*. at 23.)  However, the Commissioner argues since the ALJ found Harbolt capable of light exertional level work, the "grid rules" would not direct a finding of disabled.  (*Id*.)

The RFC determination[16] sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and

---

[16]    While Harbolt advances her third assignment of error under Step Five, it is clear to this Court Harbolt is arguing the ALJ erred in formulating the RFC, by finding her limited to the light exertional level, rather than the sedentary.  (*See* Doc. No. 13 at 22, 23.)

must consider all of a claimant's medically determinable impairments, both individually and in combination. *See* S.S.R. 96-8p, 1996 WL 374184 *5.

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 880 (N.D. Ohio 2011) (citing *Bryan v. Comm'r of Soc. Sec*., 383 Fed. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96–8p, at *7 ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC. *See Her v. Comm'r of Soc. Sec*., 203 F.3d 388, 391 (6th Cir. 1999).

Here, the ALJ determined Harbolt had the following residual functional capacity:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can push and pull as much as she can lift and carry. She can reach overhead frequently, bilaterally. She can never climb ladders or scaffolds and can never crawl. She can occasionally climb ramps and stairs, stoop, kneel and crouch. She is limited to simple, routine tasks but not at a production rate pace. She can have no more than occasional and routine workplace changes. She can have only occasional interaction with coworkers, supervisors and the public. She would be off task 10% of the time in an 8-hour workday.

(Tr. 166.)

The Court finds the RFC is supported by substantial evidence. With regard to her cane,

49

it is undisputed Harbolt did not require a cane to ambulate until December 2015.  (Tr. 197.)  On December 13, 2015, she was experiencing some left-sided numbness and underwent extensive work up for a stroke or TIA.  (Tr. 831.)  Her workup was negative and her symptoms resolved quickly.  (Tr. 825, 831, 839.)  The hospital neurologist concluded it was likely a complicated migraine.  (Tr. 846.)  On December 22, 2015, Harbolt underwent a physical therapy assessment during a brief hospital stay for nausea.  (Tr. 800, 816.)  The physical therapist issued her a cane and instructed Harbolt on its use.  (Tr. 816.)

At the hearing, Harbolt characterized the episode of her left-sided numbness as a "mini-stroke,"and testified she began to use a cane at that time.  (Tr. 190, 197.)  She further testified she continues to require a cane for ambulation.  (Tr. 205.)  However, in January 2016, Harbolt visited the emergency room, reporting back and neck pain.  (Tr. 774.)  At that time, her gait was normal and the use of a cane was not indicated.  (Tr. 776.)

The ALJ considered and discussed Harbolt's cane use in the decision.  (Tr. 166, 170, 171.)  The ALJ also noted the numerous objective findings indicating a normal gait, including the January 2016 emergency room visit.  (*Id*.)  While there is evidence Harbolt used a cane during the  month prior to the ALJ decision, the evidence also indicates Harbolt did not require a cane for the majority of the relevant period and may not have been using it consistently even following her December 2015 physical therapy visit.  Thus, the Court finds the ALJ's interpretation of the evidence was a reasonable one and does not provide grounds for reversal.

As for the ALJ's finding Harbolt was limited to a light exertional level of work, the Court also finds it supported by substantial evidence.  As discussed *supra*, MRIs and x-rays have indicated mild to moderate degenerative changes, with no significant stenosis.  (Tr. 547, 597,

633, 634, 776.)  While she reported very high levels of pain to her physicians, examination

finding often indicated no joint swelling, normal range of motion in her joints, a normal gait, and

full muscle strength.  (Tr. 545, 543, 630, 640, 661.)  The ALJ throughly noted many of these

objective findings and discussed all of the diagnostic testing in his decision.  (Tr. 167-170.)

Although Harbolt cites evidence from the record that she believes supports a more

restrictive RFC,[17] the findings of the ALJ "are not subject to reversal merely because there exists

in the record substantial evidence to support a different conclusion."  *Buxton v. Halter*, 246 F.3d

762, 772-73 (6th Cir. 2001).  Indeed, the Sixth Circuit has made clear an ALJ's decision "cannot

be overturned if substantial evidence supports the claimant's position, so long as substantial

evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336

F.3d 469, 477 (6th Cir. 2003).  In the instant case, the ALJ clearly articulated his reasons for

finding Harbolt capable of performing work as set forth in the RFC and these reasons are

---

[17]     The Court notes Harbolt, in her Reply Brief, objects to the ALJ assigning great
weight to the opinions of the state agency physicians, arguing these physicians
did not have the updated evidence which supported a finding she should be
limited to sedentary work.  (Doc. No. 16 at 3.)  It was not unreasonable for the
ALJ to accept the opinions of state agency physicians, Hughes and Sreenivas.  It
is true Dr. Hughes' June 2014 opinion and Dr. Sreenivas' August 2014 opinion
were rendered well before the ALJ's decision, which was issued on February 19,
2016.  However, "[t]here is no categorical requirement that the non-treating
source's opinion be based on a 'complete' or 'more detailed and comprehensive'
case record."  *Helm v. Comm'r of Soc. Sec.*, 2011 WL 13918 at * 4(6th Cir. Jan. 4,
2011).  Rather, the Sixth Circuit requires only "some indication that the ALJ at
least considered [later treatment records] before giving greater weight to an
opinion that is not 'based on a review of a complete case record.'"  *Blakley v.
Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) (quoting *Fisk v. Astrue*,
253 Fed. Appx. 580, 585 (6th Cir. 2007)).  A review of the ALJ decision indicates
the ALJ not only considered, but summarized, much of the evidence following the
state agency physician assessments.  (Tr. 168-171.)

supported by substantial evidence.  Accordingly, Harbolt's argument that the ALJ erred in

formulating the RFC is without merit.

Finally, the Court declines to reach a conclusion as to whether the ALJ should have

found Harbolt was "borderline" between age groups under 20 CFR §404.1563(b), and thus

concluded Harbolt was "closely approaching advanced age."[18]  All of Harbolt's arguments

regarding her borderline age situation are premised on the assumption the ALJ should have

limited her to the sedentary exertional level.  As discussed *supra,* the light-level RFC is

supported by substantial evidence.  Under the Medical-Vocational Guidelines,[19] regardless of

whether she is considered a "younger individual" or "closely approaching advanced age," the

result is the same.[20]  Thus, assuming *arguendo* the ALJ should have moved Harbolt into the

higher age category, she still would not have been found disabled.  Moreover, borderline age

cases "do not impose a *per se* procedural requirement to address such categorization in every

borderline case."  *Henry v. Comm'r of Soc. Sec.,* 678 Fed. App'x 392, 395 (6th Cir. Feb. 8,

---

[18]    Relevant to here, the ALJ placed Harbolt in the "younger individual" age
category.  (Tr. 174.)  The "younger individual" category spans ages 18-49, and is
followed by the "closely approaching advanced age" category, which spans ages
50-54.  20 CFR §404.1563(c)-(d).  The regulations provide for some flexibility
between the age categories in "borderline" age situations: "We will not apply the
age categories mechanically in a borderline situation. If you are within a few days
to a few months of reaching an older age category, and using the older age
category would result in a determination or decision that you are disabled, we will
consider whether to use the older age category after evaluating the overall impact
of all the factors in your case."  20 CFR §404.1563(b).

[19]    The Medical-Vocational Guidelines, or "grid rules," contain tables of rules which
use a claimant's RFC, age, education, and work experience to, under certain
circumstances, direct a determination of disabled or not disabled.  *See* 20 CFR Pt.
404, Subpt. P, App. 2, Sec. 200.00(a).

[20]    *See* 20 CFR Pt. 404, Subpt. P, App. 2, Sec. 202.20, 202.13.   Both of these rules
direct a finding of "not disabled."

2017.)

Accordingly, and for all the reasons set forth above, Harbolt's third assignment of error is without merit.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

s/Jonathan D. Greenberg
Jonathan D. Greenberg
United States Magistrate Judge

Date: March 2, 2018

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).